**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00100-CR**
_____

**JESUS RODRIGUEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 411th District Court**
**San Jacinto County, Texas**
**Trial Cause No. CR13,167**

**MEMORANDUM OPINION**

A jury convicted Appellant Jesus Rodriguez ("Rodriguez") of continuous sexual abuse of a young child or children, a first-degree felony. *See* Tex. Penal Code Ann. § 21.02(b), (h). The jury assessed punishment at thirty years of confinement, and the trial court sentenced Rodriguez consistent with the jury's recommendation. *See id.* § 12.32 (outlining first-degree felony punishment). In seven issues, Rodriguez complains that: the trial court committed reversible error by submitting an incorrect jury charge, and the cumulative errors in the charge violated his

1

constitutional rights; he was denied his right to a unanimous verdict; he was denied effective assistance of counsel; and the trial court committed reversible error when it admitted certain hearsay statements. As discussed below, we will affirm the trial court's judgment.

## I. BACKGROUND AND OUTCRY

During a school activity for mental health awareness, students were asked to step forward and cross an imaginary line if they had been bullied, touched inappropriately, or been a victim of other things. G.R. ("Gail"), one of Rodriguez's granddaughters, stepped forward during this activity.[1] Later that afternoon, in private, she told her Mother that she had stepped forward during that activity, then made an outcry of sexual abuse against Rodriguez. Gail was about thirteen when she outcried. Gail told Mother that Rodriguez had been touching her vagina for years, it happened many times, and the last time was the summer of 2019 before school.

After Gail outcried, Mother spoke with her younger daughter, R.R. ("Rhea"), privately and asked if anyone had ever touched her inappropriately. Mother said she asked an open-ended question and did not suggest any names, but Rhea began crying

---

[1]We use pseudonyms to refer to the victims, both minors, and we refer to their family members by their relationship to the victims to protect the victims' privacy. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

and said that her grandfather, Rodriguez, had touched her privates inappropriately many times.

Based on the girls' allegations, Mother and Father, who was Rodriguez's son, contacted law enforcement.

## II. TRIAL EVIDENCE

### A. Testimony of Forensic Interviewer Mary Phillips

Mary Phillips ("Phillips), a forensic interviewer for Children's Safe Harbor, testified that she has been in that role for about six-and-a-half years. Phillips explained that her job as an interviewer is to "gather information from the child about if something has or has not happened for them." She described her educational background and training in forensic interviewing. Since children are impressionable, she described how they interview children with open-ended questions to "reduce suggestibility." She testified that it was important to get children to a forensic interviewer as soon as possible for this reason. Phillips testified that she conducted separate forensic interviews of Gail and Rhea.

Phillips explained why children often delay their outcries, including feelings of "embarrassment, guilt, shame, and fear." She described Gail and Rhea as making "a tentative disclosure[]" with her and not wanting to go into detail; they became quieter and closed their body language. Phillips testified that the girls both identified their grandfather, Rodriguez, as the perpetrator and said it happened the same way.

3

Neither child recanted nor denied. Phillips did not see that they were coached or told what to say, although she had seen that in other cases. She added that the children did not indicate they had an axe to grind with anyone in their family or anything to gain by discussing what their grandfather had done to them. Phillips stated she does not testify about whether the kids told the truth; her job is to capture what happened and "simply to present what the children said in their forensic interviews[.]"During Phillips's testimony, video of both complainants' forensic interviews was admitted without objection.

Phillips explained that Gail did not want to go into a lot of detail and could describe some aspects of how it felt, but she would say she did not want to talk about others. When Phillips asked was there a first time, Gail described in the interview it was during Hurricane Harvey, and her aunt had a baby. Gail said some of the incidents occurred on a sectional couch in the living room and in a camper trailer at Wolf Creek. Gail told Phillips several times she did not want to go into more detail and "was able to recall several different incidences[.]"

She said that Rhea was "very active in the rapport phase" but got quieter on the topic. She recalled certain thing but not as many. They were consistent about what happened throughout. Rhea told Phillips all the instances occurred at Rodriguez's house but did not say something happened to her during the hurricane. Rhea told Phillips the last time something happened was a week before school, and

4

Gail said the last time something happened was a month or two before and "[t]here was a football game going on."

**B. Detective Jennifer Ramirez's Testimony**

Jennifer Ramirez ("Ramirez") was the detective in the San Jacinto County Sheriff's Office ultimately assigned to this case, but she no longer works as a detective; she works as a patrol officer. Ramirez testified that before this case, she worked twenty to thirty sexual abuse outcry cases and had worked delayed outcry cases. She explained that this was her first job out of the academy, and she was on the job about eleven months when assigned this case. She described a delayed outcry and testified that with them, children do not say immediately what happened because "it's someone very close to them, they're afraid that they would get in trouble, or . . . the perpetrator . . . threatened [] to harm them in some kind of way, shape or form, or somebody that they loved."

Ramirez testified that the family generated a report with another deputy, and the case was initially assigned to Detective Chase Welch. When Welch left the sheriff's office, this case was assigned to Ramirez. Once she received the case, she read over it, set up forensic exams, contacted Father to schedule forensic interviews, spoke with other witnesses after their interviews, put the case together and referred it to the DA's office. She said she received the names of two other children and cousins, C.B. ("Casey") and P.B. ("Pam"), who may have been witnesses and

5

obtained written statements from them. Ramirez watched Gail and Rhea's interviews from a separate room at Children's Safe Harbor.

In January 2020, Ramirez contacted Rodriguez to get his version of events. She conducted a non-custodial interview of Rodriguez with his lawyer present. The sheriff's office protocol is that detectives do not interact with child victims; instead, they try to get the child to a forensic interviewer as soon as possible. During the investigation, Ramirez learned about incidents that happened at different places. One incident she learned about happened at Wolf Creek, and she interviewed Casey and Pam about that and the incident that happened during the hurricane.

Ramirez testified that she did not watch the bodycam video of the deputy who took the report from Mother and Father. She also did not interview paternal grandmother T.R. ("Grandmother"), paternal aunt A.B. ("Aunt Alice"), or Aunt Alice's husband J.B. ("Uncle Joe"), who were also present on the night of the Hurricane Harvey incident. Ramirez did not interview Father's other brother, L.R. ("Uncle Luke"), either.

## C. Heather Simon's Testimony

Heather Simon ("Simon") is a forensic nurse with the Texas Forensic Nurse Examiners and has been there since September 2019. Simon outlined her education and training for the jury. Simon estimated she had performed 475 sexual assault nurse examinations ("SANE"). She described her job and testified the purpose of the

medical forensic exam is "to diagnose and treat the patient." She also gathers evidence, including the patient's words, photography, the assault kit, and DNA evidence. Simon testified that acute examinations occur within 120 hours of an assault, and nonacute examinations occur outside that window.

Simon did not speak to law enforcement or the girls' family, which allows her to remain neutral. Simon testified her observations are objective versus subjective. Simon testified the children never suggested they were fabricating this, were coached, or somebody put them up to it. Simon testified the examination is "undignified" to go through; victims must talk about what happened, and someone must look at their body and take photos. They also test for sexually transmitted infections. Simon testified she is not surprised when there is a delayed outcry, because there are many reasons for that, and she was not surprised that this case involved a delayed outcry.

In December 2019, Simon performed forensic examinations on Gail and Rhea. Simon noted that "they made eye contact[,]" and "[t]hey were great kids." During the exams, she did not locate any trauma in Gail or Rhea, which did not surprise her based on what she learned. She explained that ninety percent of the time she does not see trauma because the vagina heals very quickly. Records from the girls' examinations were admitted during Simon's testimony without objection. In Gail's records, boxes were checked showing digital penetration of the sex organ and

7

anus. In Rhea's records, a box was checked showing digital penetration of the sex organ, and Rhea reported that he touched her breasts.

Simon testified that Gail said Rodriguez touched her vagina under and over the clothes more than once, and there was digital penetration of the female genitalia and anus. Simon said that Gail reported the last incident was "a month or two ago during the daytime." Rhea's version was like Gail's, which did not concern Simon. Simon testified both girls both discussed "inappropriate touching" which could be "outside" or "inside," but both indicated penetration occurred. There is no note on how many times penetration occurred, and with digital penetration, she did not expect to always see trauma.

**D. Counselors' Testimony**

Each girl saw a licensed professional counselor after they reported the abuse. Valerie Bryan ("Bryan") treated Gail, and Christi Balkovec ("Balkovec") treated Rhea. Bryan estimated she counseled 700 to 800 child victims of sexual abuse, and Balkovec testified she has worked on 400 to 500 cases.

Bryan testified that delayed outcries were common, and "outcries are always a process." She explained that children did not think about time like adults and might remember something that occurred around an event like a birthday. Bryan testified she saw Gail for thirty-two sessions. Bryan testified that Gail arrived with trauma symptoms, which she based on Mother's report, Gail's report, and her observations.

8

Gail was "fearful" and "withdrawn." They applied trauma focused cognitive behavioral therapy. Bryan also noted Gail's "congruent affect" meaning her mood matched what she discussed. Bryan testified that Gail never revealed she was fabricating anything, and it did not appear she was coached or manipulated. Gail was consistent in her narrative during therapy, but she was not testifying that Rodriguez did or did not abuse her.

Balkovec also testified that delayed outcries were common and described why a child would wait to outcry, including feelings of fear, shame, embarrassment, and fear it would cause stress in the family. She has encountered children who outcried about abuse that occurred with people in the room or nearby. That was not surprising, and if other people denied it happened because they were in the same room, it did not mean it did not happen. Balkovec began seeing Rhea when she was eleven, and Rhea was not immediately comfortable talking about the alleged abuse. She had sixteen sessions with Rhea. She described Rhea as "very confident and very positive about herself[,]" so at the end of their treatment, Rhea was ready to move on.

Balkovec did not believe that Rhea was coached or manipulated and was consistent in discussing what happened to her. She said that Rhea did not express a desire to get revenge on anybody. Balkovec also testified that fewer than four percent of kids lie about being sexually abused, and when that happens it is usually attention-seeking behavior, which did not fit Rhea. She could not recall where she learned that

9

fewer than four percent of children lie about sexual abuse. She discharged Rhea in June 2020, explaining that Rhea was "insightful" and had a "healthy home."

## E. Testimony of Natalie Gates

Natalie Gates ("Gates") was the CPS investigator assigned to the case. As a CPS investigator, she investigated cases of neglect and child abuse. During her investigation, the identified perpetrator was the children's paternal grandfather, Rodriguez. Gates said that their focus in an investigation is the child's safety.

Gates testified that during her time at CPS she investigated over a hundred cases, and many involved the sexual abuse of children. She explained what a delayed outcry was, and she worked on multiple cases where that happened. She said that just because an outcry was delayed did not mean the abuse did not happen. Gates testified that usually the delayed outcries were the ones that happened and were "very common." She attributed delayed outcries to the children feeling fear and shame, among other things.

Gates explained the steps she took and who she interviewed, including family members, and Rodriguez at his attorney's office. She reviewed the "intake," the girls' forensic interviews, and the police report. She also interviewed A.R. ("Brother"), the girls' older brother, who did not make sexual abuse allegations. When Gates met with Rhea and Gail, she learned that Gail had been to the Rachel's Challenge Program for a school activity, which involved children getting

10

information about abuse. During the program, Gail realized she had been abused by her paternal grandfather, Rodriguez. Gates explained that children are often confused by an authority figure, like a grandfather, touching or abusing them and do not know how to process it, which happened here.

Gates testified that in December 2019, she did separate, in-person interviews with Gail and Rhea. In January 2020, she interviewed their Brother. Gates testified she remembered this case because of how the victim reported the abuse. She also remembered Mother and "how detailed she was, and how she didn't procrastinate." Gates recalled the "length of time it took . . . to get in touch with our perpetrator[.]" She testified that she remembered "[t]he child's outcry, . . . her saying what happened, . . . it was just so humble. It was innocent." Gates testified it did not appear coached or manipulated, and that "[t]here was no vendetta[.]" Gates testified that nobody from either the victims' family or the defendant's family suggested the girls were coached or fabricated this. Gates described the family as "loving" and said that Mother was "very protective" of the kids. The children never wavered, had doubts, or changed their stories.

Gates explained that she did not talk to the two cousins mentioned in the report, because another CPS investigation was opened for them and assigned to someone else, so another investigator would have spoken with them. She did not speak to the other CPS worker about them. Gates testified that it was hard to reach

11

Detective Ramirez, but she obtained the necessary information to complete the case. The only time she spoke with Rodriguez and his wife was at his lawyer's office, and she did not speak with the two cousins' parents.

Gates explained that with a CPS investigation, there are three possible determinations: (1) ruled out; (2) reason to believe the allegations occurred; or (3) unable to determine. In this case, she determined there was "[r]eason to believe" sexual abuse occurred.

## F. Testimony of CPS Supervisor Maria Garzoria

Maria Garzoria ("Garzoria") is a supervisor with Children's Protective Services ("CPS") and testified at trial. She described her educational background, experience, and training. Their primary objective is to "ensure child safety," which they tried to do here. Garzoria was familiar with the concepts of delayed outcry and an absence of physical trauma. Garzoria testified that about eighty percent of children are abused by people they know, so the delayed outcry is because they are scared, embarrassed, threatened, and do not want to hurt others around them. Garzoria said that delayed outcries are "very common."

Garzoria did not see any inconsistencies in what Gail and Rhea said but observed they made delayed outcries, which did not surprise her. She did not recall any indication that the girls fabricated this or were coached. Based on the interviews and investigation, CPS determined there was "reason to believe" for these

allegations. Garzoria testified this was significant because there was "[r]eason to believe that the children made . . . a credible outcry in regards to what had happened to them . . . they were consistent with the people whom they told."

Garzoria oversaw Gates's investigation but did not personally interview any witnesses, so her testimony is based off reading reports. She discussed potential witnesses CPS did not interview, and she did not see that Gates spoke to Pam or Casey.

## G. Mother's Testimony

Mother testified that she has three children in high school, Brother, Gail, and Rhea. Gail was born in December 2006, and Rhea was born in May 2008. Mother testified that the girls reported that Rodriguez sexually assaulted them.

Mother is married to Rodriguez's son, Father. Mother denied that there was any reason for her or her daughters to fabricate the allegations. Mother testified that this has been "[e]xtremely" hard on her and her daughters. Regarding their testimony, she said that the girls are "not excited, but they are apprehensive and ready to get this behind them." Mother said that Rodriguez's family has ignored them since the girls outcried. Mother was "[d]evastated" when she learned of the abuse, and the allegations went back to at least 2017. Mother agreed they narrowed a time for two of the allegations, but some allegations are vague.

The girls outcried in November 2019, one week before Thanksgiving. Until then, Mother did not sense anything was wrong. Mother testified that around Thanksgiving of 2019, Gail was about "a month shy of her 13th birthday[,]" and Rhea was about eleven. She testified that Rhea was always happy to go to Rodriguez's house, especially when her cousins were there. Gail occasionally said she did not want to go, but Mother said Gail is a "homebody" and likes "her alone time."

Mother testified that Hurricane Harvey occurred in August 2017. During that time, she, Father, Brother, and her sister's family stayed at Mother and Father's home, but Gail and Rhea stayed with their cousins Casey and Pam at Rodriguez's house. Mother could not recall exactly how the girls went to Rodriguez's house before the storm, but they were taken there before the flooding prevented driving. Mother explained that the flooding was worse than anticipated, and they could not get to Gail and Rhea, who wanted to stay with their cousins. Mother believed they owned an air mattress, and it was possible her husband took it to Rodriguez's house.

Mother's sister-in-law, Aunt Alice is Casey and Pam's stepmother, who was close to giving birth to her first child during the storm. On August 27, 2017, Aunt Alice went into labor, so Grandmother went to the hospital with her and her husband, which left Rodriguez home alone with Casey, Pam, Gail, and Rhea. Gail and Rhea both said Rodriguez touched them that night.

Mother testified that Gail stayed the night at Rodriguez's but returned home after Aunt Alice went into labor. The morning after Aunt Alice went into labor, Rodriguez took Gail, Rhea, and their cousins to Aunt Alice's house because they had electricity, and some friends watched them there. Rodriguez returned later with Grandmother to take the kids to the hospital to see Aunt Alice and the baby. Mother explained that after the baby was born, Gail did not want to go to the hospital and came home; Father picked her up, but Rhea asked to stay. Mother could not say exactly when but knew that Father picked Gail up after the birth but before the rest of the family went to the hospital.

Mother testified that Gail also mentioned another incident happened in a camping trailer at Wolf Creek, but they "never went into a lot of detail." Mother testified they went to Wolf Creek as family, and occasionally, the girls would go with Aunt Alice or Rodriguez and Grandmother without Father and Mother. She testified that she and Father usually went home and did not stay overnight in the camper, but sometimes the kids stayed. Mother did not know of a reason why a sleeping child would be left alone in the camper while everyone else was out on the boat.

Mother described Rhea as being "very mature" and someone who "speaks her mind." Rhea is athletic, loving, sweet, social, and extroverted, and she was hurt that

15

she lost family. She characterized Gail as introverted, independent, feisty, and likes to spend time alone.

Mother discussed Rachel's Challenge, a school program that Gail attended. She said it occurred at a skating rink and was presented to the parents as a fun way to teach the kids about mental health and issues like bullying, school shootings, and sexual assault. That day, after school, Mother went to get her children from Aunt Alice's house. In the car on the way home, Gail told Mother that she needed to speak to her when they got home. When they arrived at home, Mother told Brother and Rhea to go inside, so she could speak to Gail privately.

Once alone, Gail talked to her about Rachel's Challenge and explained that they asked questions about whether the kids had ever been hit or hurt someone else, or whether anyone had done something sexually to them that they did not want. If so, they had to step over a line. Gail told Mother that when they asked the sexual question, she had "to step across the line because papaw touches me." Mother testified that "papaw" was Rodriguez, and when she asked Gail what she meant, Gail responded that "he touches me in my privates." Mother testified she told Gail it was very serious, and Gail needed to be sure it was true, because if so, they had to do something about it. Gail started crying and told Mother it was true. When Mother asked how long it had been happening, Gail could not provide a specific answer but said it had been happening a long time and the last time was shortly before school

16

started in 2019. Mother testified that was the first time she ever heard Gail say anything like that, and she was shocked. Mother said she did not ask Gail specific dates or times, but Gail told her it happened "a lot" and "[a]lmost all of the time she went to his house[.]"

After Gail calmed down, Mother walked Gail inside and asked her to stay in Mother's room. Mother then asked Rhea to come to the car. Mother told Rhea she was not in trouble, not to be scared, but she needed her to be honest. Rhea became concerned and wanted to know if Gail was okay. Mother then asked Rhea if anyone had ever touched her inappropriately or done anything sexual to her that she did not want to happen. Mother said that Rhea immediately began crying and told her yes. Mother then asked Rhea to tell her who it was, and she said "papaw" meaning Rodriguez. Mother talked to Rhea for about fifteen minutes, and Rhea was "very upset." Mother testified that Rhea was "crying" and "very shaken up." She asked Mother if the same thing happened to Gail, and Mother told her that is what Gail just told her. Mother asked Rhea why she did not tell, and Rhea said, "I didn't tell anybody because I thought if I didn't say anything that I would be protecting [Gail, Casey, and Pam]." Mother was the first adult the girls told about the abuse.

After she reassured Rhea, she walked her inside then asked Brother to come outside and asked him the same questions. Brother repeatedly denied that anyone ever sexually abused him. Father was on the way home from work when all this

17

happened. He arrived after Mother had been talking to Brother for about ten minutes. Mother told Father what happened, and he immediately had trouble breathing and fell to the ground; he could not speak and was in shock.

Mother denied suggesting to the girls that Rodriguez did this. She testified that she "purposefully did not indicate any names or people" because she wanted accurate answers. Mother testified that the girls' outcries were separate, and Rhea did not have a chance to speak with Gail after her outcry, because Mother made Gail stay in her bedroom. Both girls named the same abuser and said that it happened at the same place. Both girls said it had been going on for years, and neither gave any specific dates, other than it happened the last time they were at his house. They both said that it happened the same way, and Rodriguez touched their privates over or under their clothes. The girls did not say that Rodriguez penetrated them or tried to have sex with them. They limited their disclosure to Rodriguez touching their privates. Later, Rhea also said that Rodriguez touched her breasts. The girls reported that Rodriguez told them not to tell anyone.

After Mother told Father what happened, they called his sister, Aunt Alice, about what happened since their children were the same age and stayed at Rodriguez's house, too. Aunt Alice and her husband came to Mother and Father's house. The adults spoke privately outside about Gail and Rhea's allegations. At some point Aunt Alice and Uncle Joe called Casey and Pam outside separately and talked

18

to them, but they denied anything happened to them. That evening, Father called the police, who told them where to file a report. Father also called Grandmother, Rodriguez's wife. Grandmother came to the house and when Father told her what happened, she asked him not to report it to police but to get the girls counseling first. When Father said they were not waiting to file a police report, Grandmother became "upset" and left. Father and Mother then took Gail and Rhea to the San Jacinto County Sheriff's Office that night to report it.

In early December 2019, they took Gail and Rhea to Children's Safe Harbor in Conroe for separate interviews. The only thing Mother told the girls was to "tell the truth." Mother testified that the girls were nervous about the interviews, but Gail said that she felt "mostly relieved to have told someone and not be holding it into herself." Detectives told her not to question the girls, because it might make them "shutdown." In December, she also took the girls for their sexual examinations with nurse Simon.

Mother explained that because of detectives being reassigned, there were some delays in the investigation early, which frustrated her. Mother testified the girls struggled in the following months, although they began counseling in January 2020. Mother denied coaching her daughters and said she did not believe in telling her children what to think or say, rather she taught them to think for themselves and speak up for themselves. She testified that her daughters had nothing to gain from

19

their outcries, rather "they've lost a lot of family members and friends." Mother learned that Gates from CPS interviewed the girls at school, and the information the girls gave Gates was consistent with what they told Mother, Simon, and the forensic interviewer. Mother did not receive reports from the forensic interviews or SANE exams, but the original detective told her that Gail alleged Rodriguez touched her vagina, and Rhea alleged he touched her vagina and breasts.

Mother testified that at some point, she vented her frustration on Facebook about the situation, which resulted in her receiving a "cease and desist letter" from Rodriguez's attorney telling her to remove the post. Mother said she complied. Mother did not know Rodriguez's work schedule but knew "for a while he worked one weekend day, because I know he worked evenings at that timeframe that this outcry was made." When the girls outcried, Pam and Casey attended school with Gail and Rhea. Mother testified that in the summer of 2019, she and Father were having a "rocky time" in their relationship. There were insinuations during her testimony that there may have been a dispute over a car Rodriguez loaned them in the summer of 2019, and over objections from the State, the defense argued they were trying to see if there were financial issues.

**H. Gail's Testimony**

Gail was sixteen during trial, and her birthday is December 13, 2006. Gail testified the most important thing is for her to tell the truth. Gail said she was nervous

20

to talk about this. Gail testified they were in court, "[b]ecause my grandpa sexually assaulted me." She said that she trusted Rodriguez and looked up to him. Gail said she did not trust Rodriguez anymore, because as long as she could remember, he hurt her and Rhea.

Gail testified that Rhea is younger, and her birthday is May 15, 2008. She did not talk to Rhea or Mother about her testimony and denied that Mother told her what to say. Gail testified she went to Safe Harbor for counseling for about a year. Gail testified that "it was difficult to talk about." She said that they do not speak to Father's side of the family anymore.

Gail testified that sometimes they spent the night at her grandparents' house. She said that during Hurricane Harvey, they had an air mattress near a couch at Rodriguez's house. Gail testified that during Hurricane Harvey, they went to visit Aunt Alice first, but the power went off at Aunt Alice's house, so they went to Rodriguez's house. Aunt Alice, Uncle Joe, Gail, Rhea, and her cousins went to Rodriguez's house. She believed that after they went to Rodriguez's, the power went out, so they used a generator. She explained that was in August 2017, and Gail thought she stayed "a couple of days." She testified that while at her grandparents' house during the storm, her grandparents were in their room, Aunt Alice, Uncle Joe, and cousins were on the couch, and she was on an air mattress. Later, Aunt Alice went into labor, so her uncle and Grandmother went with Aunt Alice to the hospital

21

while it was still dark outside. Gail testified that when they left, the people remaining at the house with her were Rodriguez, Pam, Casey, and Rhea.

She testified an incident of abuse occurred after Aunt Alice went to the hospital. Gail said that she, Pam, and Casey went back to bed, and Rodriguez went to his bedroom, but he returned later and touched her inappropriately. She said that her cousins, Casey and Pam were in the same room.

She also testified that another incident happened at Wolf Creek, where the family would go swimming and ride on her grandfather's boat. Gail said that Rodriguez usually drove the boat. She recalled telling the forensic interviewer that while at Wolf Creek, she was asleep alone in the camper while everyone else was swimming or on the boat, and Rodriguez came inside and did something to her. Gail also testified that almost every time she went to her grandparents' house, something happened. Gail testified that the last incident occurred when she, Rhea, Rodriguez, and Grandmother were at Rodriguez's house.

Around Thanksgiving of 2019, she attended a school program called Rachel's Challenge where they took the kids to the skating rink for activities. They socialized and answered questions about things like bullying. While there, they did an activity called "Cross the Line" where they told the kids to cross the line if they had ever been bullied, abused, or touched in a way that they did not want. Gail testified, "I decided to cross it because I had so much just going through my head."

That day, when Mother picked her up from school, she asked Mother to stay in the car while her siblings went inside. Gail then told Mother about Rachel's Challenge and crossing the line because someone had touched her inappropriately. Mother asked Gail "why and who," so Gail told her that "my grandpa had been doing it to me for years." Gail told Mother "that my grandpa had touched me ever since around like second or third grade." She said the first time she recalled was at their house in a guest bedroom when she was seven or eight. Rodriguez came in and started touching her privates under her clothes while she was on the bed and acted like she was asleep. Rodriguez said nothing, and neither did she. Gail testified this went on for five or six years, almost every time she went to Rodriguez's house and thought it happened over a hundred times. During Hurricane Harvey, it happened on an air mattress while her cousins were in the room, but they were sleeping. She never said anything to Casey or Pam before she told Mother, because she did not trust Pam; she felt Pam would have told, "and things would have got bad." One time, Rodriguez told her not to tell anyone.

Gail testified that when she told Mother, she thought about how this would break up their family. Gail testified that she waited to tell Mother, because she was scared and did not want to break up her family. Gail did not talk to Rhea before Rhea spoke with Mother, but after Rhea talked to Mother and returned inside, Rhea was crying and told Gail their grandpa had done it to her, too. Later that night, they went

23

to the police station and told two officers what happened. Gail testified that she told the forensic interviewer, CPS, the counselor, the police, and her mom the same thing that she told the jury.

**I. Rhea's Testimony**

Rhea testified that her birthday is in May 2008, and she was fifteen during trial. Rhea said the most important thing was for her to tell the truth, which is why she was there. She testified that she has tried to forget it and is ready to move on with her life.

Rhea testified that shortly before Thanksgiving 2019, she told Mother something serious one day after school. She said that when they arrived at home, Gail stayed in the car and talked to Mother. After that, Mother asked to speak to Rhea. Rhea saw Gail enter the house crying after speaking with Mother, then Gail went into Mother's room. Rhea saw Gail come inside but did not speak to her.

When Mother asked Rhea to talk to her, Rhea went to the car. Alone in the car, Mother asked if anyone had touched Rhea or did anything to her that she did not want them to. Rhea testified that when Mother asked that, "I knew that she knew, and I was scared." When Mother asked, Rhea said, "I told her yes. And she asked me who did it so that she could help me." When Mother asked her who had done it, Rhea told Mother it was Rodriguez. Rhea testified that Mother did not provide her with any names, rather she left the question open when she asked who had done it.

When Mother asked, Rhea was eleven years-old, and she was scared. Rhea testified that when Mother asked, "I just told her that he had touched me." She said she provided little detail then but started providing more details when she spoke with others later.

Rhea specified that Rodriguez touched her privates, and it was the part of her body she used to go to the bathroom. She said that he touched her privates on the skin and over the clothes. Rhea testified that Rodriguez told her not to say anything about it, and it happened on the couch at Rodriguez's house. The first time, she was "six or seven." She said that she could not recall if anyone else was there, but Rodriguez came and sat beside her in the living room and put his hand under her clothes without saying anything. Rhea did not know what he was doing and was scared. She could not say how many times he touched her privates, but it was "[a] lot[]" and said it happened "[m]ost of the time I went there." Rhea testified this went on "[a] long time[,]" starting when she was six or seven and continued until she was about eleven. She said most of the time it happened in the living room. Rhea said she did not tell because was she was scared, and he told her not to; she did not know what he would do. There were times Casey and Pam were in the house when this happened but were in different rooms or not around.

Rhea recalled Rodriguez touching her under her clothes while they watched football in the living room, and Gail was there. She was sitting on the corner of the

25

couch, and Rodriguez was on her left. Rhea knew he touched her with one hand, and she could not see what he was doing with his other hand. At the time, Grandmother was in the kitchen cooking spaghetti. At some point, they went out and helped their grandmother with yard work, but Rhea could not recall if it was before or after the incident.

She discussed Hurricane Harvey in 2017, when Aunt Alice was pregnant. Rhea testified she remembered going to Aunt Alice's house initially but later went to her grandparents' house. She explained that Father did not come to her grandparents' house, because "they couldn't get there." Rhea testified her grandparents slept in their room, but she could not remember where everyone else slept. During the storm, Rhea said Aunt Alice, Uncle Joe, Casey, Pam, and Gail were at the house. Rhea testified she slept on the couch that night, and she thought Gail slept on an air mattress in the living room.

Sometime during the night, Aunt Alice went to the hospital with Grandmother and Uncle Joe to have the baby. When that happened, Rhea said she stayed up for a little while, then went back to bed. Rhea did not remember if Casey or Pam were awake but said they slept in the living room, although she did not recall exactly where. After Aunt Alice, Uncle Joe, and Grandmother left for the hospital, Rodriguez came into the living room. Rhea explained, "He came in the room, and I was asleep but I had [sic] woke up because he had started to touch me, and I just

26

pretended to be asleep so that he would stop." To her knowledge, Gail, Casey, and Pam were not awake when it happened. Rhea testified that she did not remember if she told the forensic interviewer that Rodriguez tried to touch her that night, and she might have discussed it for the first time at trial.

After Rhea told Mother what happened, Rhea went inside and talked to Gail, who was upset. Rhea testified that Gail asked her then if it happened to her also, and Rhea told her it had. Rhea had not told Mother or Gail before that day. Rhea denied that Mother ever told her what to say and denied that she and Gail agreed to make this up. Rhea testified she told the jury the same thing she told Mother.

Rhea said that after she told Mother and Father came home, they went to the police station. They also went for an interview, and she told the interviewer the last time it happened was the week before school started in 2019. Rhea recalled being examined and photographed by a nurse. She testified that she was truthful with the nurse and never talked to Mother about the paperwork from the nurse.

Rhea went to counseling but attended fewer sessions than her sister. Rhea testified that she might have reached out to Grandmother after they disclosed what happened and asked if they could come over and work to earn extra money, which she agreed seemingly contradicted that she did not want to go over there and did not even want to look at pictures of the house.

## J. Jesus Rodriguez's Testimony

Rodriguez testified at trial that he works as a longshoreman and is a manager. He works the night shift from 5:00 p.m. to 4:00 a.m., Monday through Friday. Rodriguez testified he worked about 75 hours per week. Rodriguez said that people came to his house for family events. He used to attend Cornerstone Church in Cleveland and was a youth minister there for about seven years.

After going through his work schedule and the Texans' August 2019 football schedule before school, Rodriguez testified it was impossible for him to have been on the couch with Gail and Rhea at any point. He denied touching either of them inappropriately or doing anything sexual to them during that time. Rodriguez testified his daughter went into labor in 2017 during Hurricane Harvey. They were supposed to watch a fight between Mayweather and McGregor on the Saturday night the storm came in, but the power went out. His daughter had her son the following Monday. Rodriguez testified that he, his wife, Aunt Alice, Uncle Joe, Casey, and Pam were there during the hurricane. Gail and Rhea were also there, but he could not remember how they got there. That night, he and his wife slept in their room, and Aunt Alice and Uncle Joe slept in another bedroom. Rodriguez testified the kids all slept in the living room, but he does not own an air mattress and did not recall if anyone blew one up that night. He said that if Father did not come over, nobody else brought an air mattress.

28

Rodriguez said that his daughter went into labor that night. He explained that Aunt Alice had stomach pains, and they hoped she would not go into labor since the power was out and the roads were flooded. Later, while it was still dark, she came into Rodriguez's room and said she had to go, so Aunt Alice, Uncle Joe, and Rodriguez's wife left for the hospital. Rodriguez said it was after 10 p.m. when they left, and she had the baby at 1:59 p.m. He testified he did not go back to bed, and Pam was the only kid awake. On Monday morning, he finally reached them, and Uncle Joe told Rodriguez to take the kids to his house, because the power was on there. Rodriguez explained that Uncle Joe's friends stayed at their home and watched the kids, so Rodriguez could go to the hospital. Rodriguez dropped the kids off at Aunt Alice's and Uncle Joe's house to stay with their friends, then went to the hospital. Aunt Alice had the baby at 1:59 p.m., and Rodriguez said he arrived "shortly after 2:00 o'clock." Later that day, Rodriguez and his wife picked up the girls and returned to the hospital so they could see the baby. When they returned to the hospital, Rhea, Casey, and Pam were with them, but Gail was not. He did not know where Gail was at that time. Rodriguez denied touching Gail or Rhea inappropriately, penetrating them between Sunday, August 27 and 28, 2017.

Rodriguez testified they camped at Wolf Creek on Lake Livingston as a group. Rodriguez said they would bring a camper and their pontoon boat. Rodriguez testified he was the only one who drove the boat. They would also swim nearby. He

denied they let the kids stay unaccompanied in a camper away from them if they were out on the boat or swimming and did not recall Gail or Rhea staying by themselves in the camper. He denied that he did anything sexually to Gail in the camper at Wolf Creek. He also denied touching Rhea in her private areas under her clothes on the couch while Gail was there. He testified there was no time when he inadvertently touched Gail or Rhea innocently where they might have taken offense to it.

Rodriguez offered the work records to show it was physically impossible for him to do this, because he was at work. He testified that Gail and Rhea made this up. He agreed that nothing in the records he admitted as evidence showed that the girls changed their minds, that they lied, or that they had a reason to lie. He added that it did not look good for him. He believed a nine-year-old and eleven-year-old fooled six people experienced in dealing with sexual abuse.

His video interview with Detective Ramirez was admitted into evidence. Rodriguez testified that when he met with Detective Ramirez, he was not aware of all the allegations. Rodriguez met with everyone who asked, including CPS. Although he testified that he disagreed with his grandkids, he did not want to call them liars. He testified the detective and CPS failed to get his work records and interview his wife or his daughter. CPS interviewed Uncle Joe, Pam, and Casey, who

provided written statements for Detective Ramirez which refuted some of the allegations.

**K. Uncle Luke's Testimony**

Uncle Luke, who is Rodriguez's son and Father's brother, testified for the defense. Uncle Luke testified he was not at his parents' home during Hurricane Harvey and could not speak to those events. He had been with his family to Wolf Creek many times and had never personally seen anything inappropriate between his father and any child. If he had, Uncle Luke said he would have confronted his father about it. Uncle Luke feels torn by the situation and did not believe the allegations but loves them all. He and Father are not speaking, which was mutual, but they had issues outside of this. Uncle Luke testified that Rodriguez was their youth pastor at church, but nobody raised any issues about Rodriguez's behavior during that time.

**L. Grandmother's Testimony**

Grandmother is Rodriguez's wife. She said she used to attend Cornerstone Church, and many members came to court. Grandmother learned of the allegations one night when Father called her, told her they had an emergency, and asked if she could come over alone. This happened about a week before Thanksgiving 2019. When she arrived at Father's house, he met her outside, told her that he loved her, but that Rodriguez had touched the girls. Grandmother testified that she was "devastated." She remembered that her daughter, Aunt Alice, and son-in-law Uncle

Joe were there but did not see Pam or Casey. Grandmother asked to speak with Gail and Rhea that night, but they would not let her see them. She remembered Father and Aunt Alice were talking, but Father began "hollering at [Aunt Alice]" and told them they were leaving.

Grandmother testified that she confronted Rodriguez. She called him and told him he needed to come home from work but did not say why. Grandmother testified that when Rodriguez arrived home, she "let him have it." She said she "questioned him[,]" and "was mad." Rodriguez told her it was not true, he did not do it, and did not know what they were talking about. The next day, Aunt Alice, Uncle Joe, and Uncle Luke came over and questioned Rodriguez. Father did not come over but texted her and asked what Rodriguez said.

Grandmother testified that nothing ever seemed odd between Rodriguez and Gail or Rodriguez and Rhea. She never left Rodriguez alone on the property with Gail or Rhea, and said they were usually together. Grandmother never witnessed Rodriguez touch Gail or Rhea in appropriately while they were on the couch. Grandmother testified that nobody from CPS or the Sheriff's Department took her statement. They also never subpoenaed her or Rodriguez's phone records. Grandmother testified that even if the CPS records were true, it would not change her opinion about what happened.

She testified that in 2019, the week before school, Rhea reached out about coming over to do yardwork to earn money. Grandmother testified she checked her text messages, and the girls did not come over the week before school. She denied Rhea's allegation that the girls were at the house watching football the week before school started when something happened.

Grandmother also discussed the events during Hurricane Harvey and testified that their daughter's first baby was born around that time on August 28 about 1:59 p.m. She remembered that when family members lost electricity, they came to their house, including Father, Aunt Alice, Uncle Joe, Pam, Casey, and Rhea, but she did not recall Gail being there. She did not remember an air mattress being there, and they did not have one. Grandmother testified that they did not sleep much, but she and Rodriguez were in their bedroom, and Aunt Alice and Uncle Joe were in the back bedroom. The kids "were all laid out on the couch." Eventually, Aunt Alice came into their room and told them she needed to go to the hospital, so Grandmother and Uncle Joe took her while Rodriguez stayed with the kids. It was still dark when they left for the hospital. Eventually, Rodriguez took the kids to Aunt Alice's and Uncle Joe's house, then he came to the hospital. Grandmother testified that later, she and Rodriguez picked up the kids. They brought the kids to the hospital to see the baby, but it was the next day. Gail did not go to the hospital. Grandmother did not observe Rodriguez doing anything inappropriate in the living room before she left.

33

Grandmother testified they bought a "motorhome" in 2016 or 2017 and began going with the family to Wolf Creek. Grandmother testified they would not have left one of the kids in the camper sleeping alone while they were out swimming or boating. She said any allegation they were on the boat and Rodriguez went back and did something inappropriate was probably untrue. Grandmother testified she was not so financially dependent on Rodriguez that she would turn a blind eye. Nobody else has outcried against her husband.

Grandmother discussed the dynamics in the girls' home. Grandmother described an incident that upset her where Father became upset with Brother at a family dinner. She said Father became so angry that he grabbed Brother by the back of the neck and told him to get in the car. Grandmother also testified that in the summer of 2019, Father and Mother were not on good terms, although she did not allege that they told the girls to say anything. She said that Gail and Rhea did not confide in her, Aunt Alice, or their cousins.

## M. Cousins' Testimony

Pam and Casey are Aunt Alice's stepdaughters and the cousins of Gail and Rhea. Pam was eighteen when she testified and about twelve or thirteen in 2017. Casey was fifteen when she testified and about eleven or twelve during Hurricane Harvey.

Pam testified that she wrote a statement about Gail but not about Rhea; law enforcement asked her to write what happened during the hurricane and the night her brother was born. They testified they were at their grandparents' house that night. Casey and Pam said they were there with their grandparents, their mom, their dad, and Rhea that night, but Gail did not come over that night. Pam testified, "I slept on the couch. I spent most of the night in the back room with my parents. . . . once they left, I was on the couch the rest of the night." Pam explained that when her mom began having more contractions, she went to the back room, and when they left for the hospital, Pam returned to the living room and slept on the couch with Casey and Rhea. Casey said that her mom, dad, and Pam went to the back room to sleep, but she and Rhea slept on the couch. When she woke up later, her mom was in labor. She thought only her mom and dad went to the hospital and did not remember whether Grandmother went.

Pam understood that her cousins made allegations against Rodriguez, and after they did, someone from the sheriff's department talked to Pam. The girls said the electricity went out that night. Pam did not sleep on a blow-up mattress, and Casey did not recall one being at the house. Pam did not remember who went to the hospital that night with her mom. She said the next morning at the house she was there with her grandparents, Rhea and Casey. Casey testified that the next morning,

her grandpa took them somewhere so he could go to the hospital, but she did not remember where. She eventually went to the hospital to see her baby brother.

**N. Uncle Joe's Testimony**

Uncle Joe, Aunt Alice's husband and Casey and Pam's father, also testified. Uncle Joe testified that his wife went into labor during Hurricane Harvey. Earlier that day, his family went to his in-laws' house. Uncle Joe said that Grandmother, Rodriguez, Pam, Casey, his wife, his wife's grandmother, and Father was there. Uncle Joe testified that he and his wife were in the back room, and the kids slept in the living room. Eventually, he, his wife, and Grandmother went to the hospital. He did not remember a blow-up mattress in the living room.

Uncle Joe testified the baby was born on Monday. They arranged for the kids to be dropped off at their house, so friends could watch them while Rodriguez came to the hospital. Rodriguez and Grandmother left the hospital later to get the kids and return to the hospital. He remembered that Rhea came to the hospital but did not remember if Gail was there.

**O. Aunt Alice's Testimony**

Aunt Alice testified that she is married to Uncle Joe, her father is Rodriguez, and her brother is the complainants' Father. Shortly before Thanksgiving 2019, her nieces, Gail and Rhea, made these allegations against her father. She testified that Father called and told her to come over. He did not say why, but it seemed important,

so she went to their house. When she arrived, her sister-in-law, Mother, met her in the driveway. Mother then told Aunt Alice about the allegations but did not provide details, only that Gail stepped forward at the Rachel's Challenge event when asked if anyone had been molested and later told Mother "that it was her papaw." They also learned that Rhea told Mother something happened with her. Grandmother eventually arrived, and Father told her about the girls' allegations. Aunt Alice had Uncle Joe bring their girls, Casey and Pam over because she thought it was important to speak to them. That day, Casey and Pam repeatedly denied that their grandpa touched them. Aunt Alice testified they did not learn any details about the allegations that night.

Before Mother and Father left for the sheriff's department, Aunt Alice told Father that they "need to really get the girls in counseling[.]" Father became angry, screamed at her, and said it was "because you think my girls are lying." So, Aunt Alice and Uncle Joe took their children and left. Aunt Alice testified she never insinuated they should not go to the police also; she just felt they needed counseling. She explained a rift began between her and Father; he wanted Aunt Alice to choose a side, and if she did not, she could not be a part of her nieces' lives anymore. Later that night, Mother and Father took the girls to the sheriff's department.

Aunt Alice later learned more about the specific allegations, including that both Gail and Rhea said something happened during Hurricane Harvey. During the

37

storm, they were at her parents' house, and the electricity went out. Aunt Alice said that she, her husband, Casey, Pam, Rhea, her grandmother, and her parents were all at the house. Her grandmother left later. Her parents were in their room, and she and her husband were in the back room, but moved around, because she was having contractions. Aunt Alice, her husband, and Grandmother went to the hospital late Sunday night and into Monday morning, arriving when it was still dark.

When they left, Casey, Pam, and Rhea stayed at the house with Rodriguez. Rodriguez wanted to come to the hospital, so he eventually brought the kids to Aunt Alice's house to stay with friends since they had electricity, then he came to the hospital. The next day, Rodriguez and Grandmother brought Casey, Pam, and Rhea to the hospital.

Aunt Alice was unaware of the Wolf Creek allegations but denied they would have left any kids alone in the camper. Looking back, Aunt Alice never saw anything inappropriate between her Rodriguez and Gail or Rhea. She testified that she would not look the other way if she felt something inappropriate was happening with a child.

## P. Testimony of Complainants' Friends

Twin brothers B.S. and B.S. testified that they were friends with Gail in seventh grade. They were at Rachel's Challenge with Gail when she crossed the line. The brothers said that Gail was crying when she crossed the line, then she told them

that her grandfather sexually assaulted her repeatedly, with one brother testifying her grandpa "kept doing it over time." One brother said that Gail talked to him about it four times and said her grandpa did it many times. She did not elaborate on specific allegations with them. Both brothers testified they believed Gail.

Another friend of Gail's, A.M., testified. He used to go to school with Gail, and they stay in touch. In the fall of 2021, Gail told A.M. that her grandfather sexually assaulted her, and she was upset. He said she talked to him about it twice but did not provide other details. He also said he believed Gail when she told him about this, because "her emotions are very raw, very genuine." K.D., another of Gail's friends, also testified that in 2021, Gail told her multiple times that her grandpa previously sexually assaulted her but did not provide details beyond that.

E.C., a friend of Rhea's, testified that in October 2020, Rhea was at a sleepover with her and another friend. They were telling secrets, and Rhea told them that throughout her childhood her grandpa molested her and her sister. Rhea did not specify what her grandfather did. When Rhea told them, she cried. E.C. said they discussed it multiple times, and Rhea was consistent about what happened and who did it. Rhea told E.C. it happened between the ages of six and eleven.

## Q. Other Evidence

Additional evidence admitted at trial included family photographs, photographs of Rodriguez's home, video recordings of the girls' forensic interviews,

39

CPS records, Rodriguez's recorded interview with detectives, and SANE records, among other things.

## III. INDICTMENT, VOIR DIRE, JURY CHARGE OPENING, CLOSING, AND VERDICT

The San Jacinto County Grand Jury indicted Rodriguez for continuous sexual abuse of a young child, alleging that

> during a period that was 30 or more days in duration, to-wit: from on or about August 25, 2017 through August 30, 2019, when the Defendant was 17 years of age or older, commit two or more acts of sexual abuse against a child or children younger than 14 years of age, namely that, Defendant, did then and there with the intent to gratify the sexual desire of said Defendant, engage in sexual contact with [Gail] by touching the vagina of [Gail] with defendant's fingers, a child younger than 14 years of age, that Defendant, did then and there with the intent to gratify the sexual desire of said Defendant, engage in sexual contact with [Rhea] by touching the vagina of [Rhea] with defendant's fingers and by rubbing the breasts of [Rhea] with defendant's hands, a child younger than 14 years of age.

During opening statements, the State described Rodriguez touching the complainants' sexual organs repeatedly. The State also explained how Gail outcried that Rodriguez touched her "privates" and that when asked by Mother, Rhea said that Rodriguez had also been touching her. The State focused on Rodriguez contacting the vagina. Rodriguez instead focused on the witnesses' "veracity" and how difficult it was to prove a negative. He also insinuated during opening that this was something the girls made up and that grew out of control; rather than admit they were not telling the truth, the "little snowball . . . turn[ed] into a giant avalanche[.]"

40

Rodriguez also insinuated during voir dire that when the girls outcried, they had no idea they would have to talk about it years later in court; with this insinuation, Rodriguez asked the panel why someone under those circumstances would not tell the truth, with the suggestion it may be because they were embarrassed to say they lied before.

At the charge conference, Rodriguez's attorney only objected to the State's request for a lesser included charge of indecency by contact. The State argued that the lesser included was "included in the continuous sexual assault." Rodriguez's attorney then agreed that it was "a lesser included statutorily" but stated that it was not material in this case. The trial court allowed the lesser included offense in the charge.

As to continuous sexual abuse of a child, the abstract portion of the court's charge instructed as follows:

> A person commits an offense if during a period that is thirty or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims and at the time of the commission of each of the acts of sexual abuse, the actor is seventeen years old or older and the victim is a child younger than fourteen years old.

> To prove that the defendant is guilty of continuous sexual abuse of a young child or young children, the state must prove, beyond a reasonable doubt, four elements. The elements are that—

> 1. the defendant committed two or more acts of sexual abuse; and

2.    these acts of sexual abuse were committed during a period that is thirty or more days in duration; and

3.    at the time of commission of each of the acts of sexual abuse the defendant was seventeen years old or older; and

4.    at the time of commission of each of the acts of sexual abuse the victim was a child younger than fourteen years old.

Indecency with a child is an act of sexual abuse if the state proves, beyond a reasonable doubt, three elements. The elements are that—

1.    the defendant engaged in sexual contact with another person by—

a. any touching of the anus or any part of the genitals of the person; or

b. any touching of any part of the body of the person with the anus, breast, or any part of the genitals of the defendant; and

2.    the other person was a child younger than seventeen years old; and

3.    the defendant did this with the intent to arouse or gratify the sexual desire of any person.

The charge then provided the following definitions:

A person acts with intent to arouse or gratify sexual desire if it is the person's conscious objective or desire to gratify sexual desire.

Sexual Contact means any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child or any touching of any part of the body of the child, including touching through clothing, with the anus, breast or any part of the genitals of a person, if the acts are committed with the intent to arouse or gratify the sexual desire of any person.

42

The application portion of the court's charge included the following:

Now, if you find from the evidence beyond a reasonable doubt that during a period that was 30 days or more in duration, from on or about the 25th day of August, 2017 through the 30th day of August, 2019 in San Jacinto County, Texas, the Defendant, JESUS RODRIGUEZ aka JESSE RODRIGUEZ, when the Defendant was 17 years of age or older, commit two or more acts of sexual abuse against a child or children younger than 14 years of age, namely that Defendant, did then and there with the intent to gratify the sexual desire of said Defendant, engage in sexual contact with [Gail] by touching the vagina of [Gail] with Defendant's fingers, a child younger than 13 years of age, that, Defendant did then and there with the intent to gratify the sexual desire of said Defendant, engage in sexual contact with [Rhea] by touching the vagina of [Rhea] with Defendant's fingers and by rubbing the breasts of [Rhea] with Defendant's hands, a child younger than 14 years of age, then you will find the defendant guilty of the offense of Contin[u]ous Sexual Assault of a Young Child, as charged in the indictment.

Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict "Not Guilty" and next consider whether the defendant is guilty of the lesser-included offense of Indecency With A Child.

Now, if you find from the evidence beyond a reasonable doubt that on or about the 25th day of August, 2017 through the 30th day of August, 2019, in San Jacinto County, Texas, the defendant, JESUS RODRIGUEZ aka JESSE RODRIGUEZ, did then and here engage in sexual contact with [Gail], a person younger than 17 years of age, with intent to arouse or gratify the sexual desire of the Defendant, then you will find the defendant guilty of the offense of Indecency with a Child by Contact as a lesser included offense of the charge in the indictment.

Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict "Not Guilty".

Now, if you find from the evidence beyond a reasonable doubt that on or about the 25th day of August, 2017 through the 30th day of August, 2019, in San Jacinto County, Texas, the defendant, JESUS RODRIGUEZ aka JESSE RODRIGUEZ, did then and there engage in sexual contact with [Rhea], a person younger than 17 years of age, with intent to arouse or gratify the sexual desire of the Defendant, then you will find the defendant guilty of the offense of Indecency with a Child by Contact as a lesser included offense of the charge in the indictment.

Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict "Not Guilty".

Although the charge did not separately instruct the jurors to unanimously agree on a verdict, when instructing about the foreperson's duties, it provided that "[i]t is his or her duty to preside at your deliberations, vote with you and when you have unanimously agreed upon a verdict, to certify your verdict by using the appropriate form attached hereto and signing the name as the Foreperson." The charge then provided a verdict form, giving jurors the option of finding Rodriguez: (1) not guilty; or (2) guilty of continuous sexual assault of a young child as charged in the indictment; or (3) guilty of the lesser-included offense of indecency with a child by contact.

In closing, neither the State nor Rodriguez mentioned the allegation that he also touched Rhea's breasts. Rodriguez referenced the indictment and said the State must prove seven elements. Rodriguez also mentioned only the allegations that Rodriguez touched or penetrated Gail's genitals and anus and Rhea's genitals.

44

Rodriguez's closing argument was that this did not happen, he did not have the opportunity to do what the girls claimed when they claimed it.

The jury found him guilty of continuous sexual assault of a young child. The jury was individually polled, and all twelve jurors indicated that they voted guilty on the charge of continuous sexual assault of a young child. The jury assessed punishment at thirty years of confinement, and the trial court sentenced him accordingly.

## IV. ISSUES ONE THROUGH FIVE: JURY CHARGE ERROR AND UNANIMOUS VERDICT[2]

In issues one through five, Rodriguez complains about multiple jury charge issues, specifically that: (1) he was egregiously harmed and denied due process by a fundamentally defective jury charge which instructed the jury to convict him for continuous sexual abuse of a young child based on conduct expressly excluded by Texas Penal Code section 21.02(c)(2); (2) the trial court committed reversible error by failing to instruct the jury that the verdict must be unanimous as required by Texas Penal Code section 21.02(d); (3) he was denied his constitutional right to a unanimous jury verdict; (4) the trial court committed reversible error by providing a jury instruction on "intent to arouse or gratify sexual desire" which was a comment on the evidence; and (5) the cumulative harm from multiple jury charge errors

---

[2]For purposes of clarity, in our analysis, we do not address these issues in numerical order. We instead begin with issue four.

deprived him of a fair trial and vitally affected his defensive theory. The State concedes error on issues one and two but contends they were not egregiously harmful. In response to issue three, the State contends that the record shows the jury's verdict was unanimous. Regarding issue four, the State asserts that the intent to arouse or gratify instruction was not erroneous, and even if it was, it did not constitute harmful error, as it did not go to a contested issue. Finally, the State argues that the law does not allow for reversal based on cumulative harm that is theoretical.

## A. Standard of Review

Reviewing jury charge complaints on appeal is a two-step process. *See Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022). "First, we determine whether the charge is erroneous." *Id.* If so, we next determine whether the appellant was harmed by the erroneous charge. *Id.*; *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013). "If charge error is found, the appellate court must analyze that error for harm." *Reed v. State*, 680 S.W.3d 620, 625 (Tex. Crim. App. 2023) (citing *Campbell v. State*, 664 S.W.3d 240, 245 (Tex. Crim. App. 2022)) (other citations omitted). There are two standards of review for claims of jury charge error, and the standard we apply depends on whether the appellant timely objected to the charge in the trial court. *See Alcoser*, 663 S.W.3d at 165; *see also Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). "If a defendant timely objects to the alleged jury-charge error, the record need only show 'some harm' to

obtain relief." *Alcoser*, 663 S.W.3d at 165 (quoting *Almanza*, 686 S.W.2d at 171). If, on the other hand, an appellant fails to timely object, "the record must show 'egregious harm.'" *Id.* (quoting *Almanza*, 686 S.W.2d at 171).

We will reverse for an unobjected-to erroneous jury charge only when the error caused the appellant actual, egregious harm, rather than theoretical harm. *See Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015) (citation omitted); *Almanza*, 686 S.W.2d at 171. "Actual harm is established when the erroneous jury instruction affected 'the very basis of the case,' 'deprive[d] the defendant of a valuable right,' or 'vitally affect[ed] a defensive theory.'" *Arrington*, 451 S.W.3d at 840 (quoting *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011)); *Almanza*, 686 S.W.2d at 172; *see also Chambers v. State*, 580 S.W.3d 149 154 (Tex. Crim. App. 2019) (noting egregious harm results when the error "created such harm that the appellant was deprived of a fair and impartial trial"). This is a fact-specific analysis performed case-by-case. *Arrington*, 451 S.W.3d at 840 (citing *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013)). When conducting the case-specific harm assessment, we consider: (1) the entire jury charge; (2) the state of the evidence, including contested issues and weight of the probative evidence; (3) the parties' arguments; and (4) all other relevant information in the record. *See id.* (citing *Almanza*, 686 S.W.2d at 171). We also consider "the likelihood that the jury would in fact have reached a non-unanimous verdict on the

facts of the particular case." *Jourdan v. State*, 428 S.W.3d 86, 98 (Tex. Crim. App. 2014) (citations omitted).

**B. Applicable Law**

Rodriguez complains of three jury charge errors: (1) that it impermissibly included touching of the breast, conduct expressly excluded by the statute; (2) that it lacks an instruction on unanimity; and (3) that including a definition of "intent to arouse or gratify" impermissibly commented on the weight of the evidence. In response to issues one and two, the State concedes two errors in the jury charge: (1) that the trial court erred by including "touching . . . the breast of a child" as prohibited by Texas Penal Code Section 21.02(2)(c); and (2) the trial court failed to instruct the jury on unanimity as required by the statute. In response to issue four, the State asserts that including the instruction on "intent to arouse or gratify" was not erroneous, but even if it was, it did not go to a contested issue so was not harmful.

Given the State's concession of two errors in the charge and Rodriguez's failure to timely object, we must determine whether the errors raised in issues one and two egregiously harmed Rodriguez. *See Reed*, 680 S.W.3d at 625; *Alcoser*, 663 S.W.3d at 165; *Almanza*, 686 S.W.2d at 171. For reasons we will explain below, we conclude that the definition of "intent to arouse or gratify" he raises in his fourth issue was not erroneous, so a harm analysis is unwarranted as it pertains to that issue.

48

"A jury charge that improperly states the law or the elements of the offense is erroneous." *Fields v. State*, 696 S.W.3d 11, 17 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd) (citation omitted). Similarly, a jury charge's application paragraph that incorrectly applies the pertinent law to the facts of the case is erroneous. *Id.*; *see also Cortez v. State*, 469 S.W.3d 593, 598 (Tex. Crim. App. 2015).

The continuous sexual abuse of a child statute allows for an offense to be based on two or more acts of sexual abuse over thirty days or more and specifically includes indecency with a child under section 21.11(a)(1), except that the continuous sexual abuse of a child statute expressly excludes touching of the breast as a qualifying act of sexual abuse. *See* Tex. Penal Code Ann. § 21.02(b), (c)(2); *see also Myers v. State*, No. 02-17-003982-CV, 2019 WL 2223578, at *1 (Tex. App.—Fort Worth May 23, 2019, pet. ref'd) (mem. op., not designated for publication). In turn, section 21.11(a)(1) provides that one commits indecency with a child if the child is younger than seventeen, and the person "engages in sexual contact with the child[.]" Tex. Penal Code Ann. § 21.11(a)(1). As applicable here, section 21.11 then provides, "'sexual contact' means any of the following acts, if committed with the intent to arouse or gratify the sexual desire of any person: (1) any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of the child[.]" *Id.* § 21.11(c)(1).

Therefore, we agree with the parties that the trial court erred in the abstract portion of the charge by including breast-touching in the definition of "[s]exual contact." *See id.* § 21.02(c)(2). This error was carried over into the application portion of the charge by including language that Defendant "engage[d] in sexual contact with [Rhea] by touching the vagina of [Rhea] with Defendant's fingers *and* by rubbing the breasts of [Rhea] with Defendant's hand[.]" (Emphasis added.)

Likewise, the charge failed to include a separate instruction that the jury's verdict be unanimous. Our state constitution requires jury unanimity in felony cases. *See Floyd v. State*, PD-0148-23, 2024 WL 4757855, at *3 (Tex. Crim. App. Nov. 13, 2024); *Ngo v. State*, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005); *see also* Tex. Const. art. V, § 13. As our sister court explained,

> This means that each juror must agree that the defendant committed the same specific criminal act. There is, however, a crucial distinction between a fact that is a specific actus reus element of the crime and one that is but the means to the commission of a specific actus reus element. The jurors must unanimously agree on each element of the crime in order to convict, but the jurors need not agree on all the underlying facts that make up a particular element. When alternative manners and means of committing an offense are submitted to a jury, it is appropriate for the jury to return a general verdict of guilty if the evidence supports a conviction under any one of them.

*Jacobsen v. State*, 325 S.W.3d 733, 736 (Tex. App.—Austin 2010, no pet.) (internal citations omitted). The continuous sexual abuse of a child statute provides,

> If a jury is the trier of fact, members of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed. The

50

jurors must agree unanimously that the defendant, during a period that is 30 days or more days in duration, committed two or more acts of sexual abuse.

Tex. Penal Code Ann. § 21.02(d). Under this statute, it is the pattern of behavior over the requisite period that must be unanimous rather than the individual acts of sexual abuse that make up the pattern, which "are merely evidentiary facts, the manner and means by which the actus reus element is committed." *Jacobsen*, 325 S.W.3d at 737. When evidence exists of more than two acts of abuse over the requisite period, "section 21.02(d) makes it clear that the jurors need not agree as to which individual acts were committed so long as they agree that the defendant committed at least two." *Id*.

## C. Analysis Issue Four: Definition of "Intent to Arouse or Gratify"

We begin our analysis with issue four. In his fourth issue, Rodriguez complains of a third charge error, and the "intent to arouse or gratify" definition was a non-statutory instruction that commented on the evidence by unfairly emphasizing a fact in dispute. We disagree that this definition was erroneous. As explained above, an act of sexual abuse under section 21.02(c) includes indecency with a child under section 21.11(a)(1) except for touching of breasts. *See* Tex. Penal Code Ann. §§ 21.02(c), 21.11(a)(1). Section 21.11(a)(1) then instructs that indecency with a child includes "sexual contact," and section 21.11(c) outlines what constitutes "sexual

51

contact," including the requisite element of "intent to arouse or gratify the sexual desire of any person." *Id.* § 21.11(a)(1), (c).

Elsewhere, in its "Definitions of Culpable Mental States," the Penal Code provides, "[A] person acts intentionally or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). Contrary to Rodriguez's assertion, this definition was statutorily correct. It incorporated the Penal Code's statutory definition of intent as a culpable mental state, which is a "conscious objective or desire" and coupled it with the requisite specific element of "intent to arouse or gratify" from the "sexual contact" statute. *Id.* § 6.03; 21.11(c). Further, the "intent to arouse or gratify" definition Rodriguez complains of tracks verbatim the Texas Criminal Pattern Jury Charge, which states, "[a] person acts with intent to arouse or gratify sexual desire if it is the person's conscious objective or desire to gratify sexual desire." *See* State Bar of Tex., *Texas Criminal Pattern Jury Charges: Crimes Against Persons & Property* PJC 84.2 (2020). Since we conclude the definition of "intent to arouse or gratify" was not erroneous, we do not address it in our egregious harm analysis below. We overrule issue four.

## D. Analysis: Issues One and Two – Egregious Harm

With these principles in mind, we turn to the four *Almanza* factors in assessing whether Rodriguez suffered actual egregious harm, rather than theoretical harm from

the errors raised in issues one and two. *See Arrington*, 451 S.W.3d at 840; *Almanza*, 686 S.W.2d at 171.

## 1. Entirety of the Charge

We first consider the entire charge. *See Arrington*, 451 S.W.3d at 840; *Almanza*, 686 S.W.2d at 171. The abstract portion of the charge accurately stated the substantive law on the offense of continuous sexual abuse of a young child. It provided the following definition:

> A person commits an offense if during a period that is thirty or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims and at the time of the commission of each of the acts of sexual abuse, the actor is seventeen years old or older and the victim is a child younger than fourteen years old.

*See* Tex. Penal Code Ann. § 21.02(b). ("A person commits an offense if ... during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and ... at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is ... a child younger than 14 years of age ...."). The abstract portion also tracks verbatim the Texas Pattern Jury Charge in instructing what elements the State must prove for the offense of continuous sexual abuse of a child. Specifically,

> To prove that the defendant is guilty of continuous sexual abuse of a young child or young children, the state must prove, beyond a reasonable doubt, four elements. The elements are that—

53

1.      the defendant committed two or more acts of sexual abuse; and

2.      these acts of sexual abuse were committed during a period that is thirty or more days in duration; and

3.      at the time of commission of each of the acts of sexual abuse the defendant was seventeen years old or older; and

4.      at the time of commission of each of the acts of sexual abuse the victim was a child younger than fourteen years old.

*See* State Bar of Tex., *Texas Criminal Pattern Jury Charges: Crimes Against Persons & Property* PJC 84.2 (2020). The abstract portion of the charge correctly defined "sexual contact" under the indecency with a child statute. *See* Tex. Penal Code Ann. § 21.11(c)(1) ("'sexual contact' means the following acts, if committed with the intent to arouse or gratify the sexual desire of any person: (1) any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child[]"). Yet the charge failed to instruct that for purposes of continuous sexual abuse of a child, touching of the breasts is specifically excluded as an act of sexual abuse, although it qualifies as "sexual contact" for purposes of the indecency with a child offense. *Compare id.* § 21.02(b), (c)(2), *with* § 21.11(a)(1), (c)(1).

Under these statutes, the charging instrument, and the evidence, Rodriguez could be convicted of continuous sexual abuse of a child if the jury determined that he, with the intent to arouse or gratify his sexual desire: (1) touched Gail's vagina

two or more times over a period of thirty days or more in duration; (2) touched Rhea's vagina two or more times over a period of thirty days or more in duration; or (3) touched a combination of Gail and Rhea's vaginas over a period of thirty days or more in duration. *See id.* §§ 21.02(b), (c)(2), 21.11(a)(1), (c)(1). That said, Rodriguez could not be convicted of continuous sexual abuse of a child if predicated on touching Rhea's breasts because doing so did not constitute sexual contact that qualified as an act of sexual abuse under 21.02(c)(2). *See id.* § 21.02(c)(2). Therefore, as the parties concede and we concluded *supra*, including touching of the breasts in the application paragraph was erroneous. *See id.*; *see also Cortez*, 469 S.W.3d at 598; *Fields*, 696 S.W.3d at 17; *Myers*, 2019 WL 2223578, at *1.

Still, the application paragraph as it pertained to touching Rhea was framed in the conjunctive rather than the disjunctive. The paragraph included language that Defendant "engage[d] in sexual contact with [Rhea] by touching the vagina of [Rhea] with Defendant's fingers *and* by rubbing the breasts of Rhea with Defendant's hand[.]" (Emphasis added.) In other words, the jury was instructed that to find that Rodriguez engaged in sexual contact with Rhea, it had to be by both touching her vagina and breasts. The sexual contact could not be by touching Rhea's breasts alone, which is not considered an act of sexual abuse. *See id.* § 21.02(c)(2). Instead, the charge instructed the jury that the sexual contact must also include touching her vagina, which the continuous sexual abuse of a child statute specifically

55

includes as an act of sexual abuse. *See id.* §§ 21.02(b), (c)(2), 21.11(a)(1). Since any harm in including the touching of Rhea's breasts framed in the conjunctive with touching of her vagina, which is an act of sexual abuse under the statute, we conclude the resulting harm from the error was theoretical rather than actual. This, coupled with other proper definitions in the abstract portion of the charge, mitigates against actual egregious harm, although harm may have theoretically been possible.

As discussed above, the charge did not contain a separate instruction that the jurors' verdict must be unanimous. That said, in reference to the foreperson's duties, the charge instructed the jury that "when you have unanimously agreed upon a verdict," the foreperson would certify it by using the appropriate form and signing it. The implication is that before the foreperson could certify the verdict, it had to be unanimous. Additionally, if the jury agreed that Rodriguez committed two or more acts of sexual abuse within a period of thirty days or more in duration, they did not have to unanimously agree on the specific acts. *See id.* § 21.02(d); *Jacobsen*, 325 S.W.3d at 737. Since the charge instructed that the foreperson would certify the verdict once the jury "unanimously agreed," we conclude this likewise mitigates against a finding of egregious harm in this case.

### 2. State of the Evidence

We next examine the state of the evidence to assess whether the evidence made it more or less likely that the jury-charge errors egregiously harmed

Rodriguez. *See Arrington*, 451 S.W.3d at 840; *Almanza*, 686 S.W.2d at 171. Rodriguez did not assert a sufficiency complaint on appeal. Considering the entire record, the evidence sufficiently supports Rodriguez's guilt of continuous sexual abuse of a child based on his touching Gail's and Rhea's genitals on multiple occasions. Both girls testified that Rodriguez touched their genitals on many occasions. Gail said that it happened almost every time she went over there for five or six years. Likewise, Rhea could not say how many times he touched her privates, but it was "[a] lot[]" and said it happened "[m]ost of the time I went there." Rhea testified this occurred over a long period, starting when she was six or seven until she was about eleven. Rhea and Gail both described specific instances where Rodriguez touched them and used a camping trip, the start of school, and a severe weather event as points of reference; they also described multiple specific instances of Rodriguez touching them inappropriately in their forensic interviews, which were admitted into evidence.

Mother testified that the girls did not provide specific dates, but they both said Rodriguez had touched their privates and it had been going on for years. In her initial disclosure to Mother, Rhea did not mention that Rodriguez had touched her breasts, too, but she later told Mother that Rodriguez had also touched her breasts. Mother also said that she was not privy to the SANE exam, but a detective told her that Gail alleged Rodriguez touched her privates, and Rhea outcried that Rodriguez touched

57

her vagina and breasts. This was the only time the jury heard any testimony about Rodriguez touching Rhea's breasts.

The SANE also testified that each girl said Rodriguez touched their vagina with his hands, both under and over the clothes, more than once. The SANE's records admitted at trial without objection also show that both girls claimed digital penetration. Rhea's narrative contained in the records said he touched her breasts, although the SANE did not testify about this. In the exhibits and records spanning 265 pages, there were only seven references to Rodriguez touching Rhea's breasts.

Rodriguez never admitted touching either girl's vagina or Rhea's breasts. Nor was there any evidence that Rodriguez touched only Rhea's breasts. Instead, the defensive theory was that he never touched the girls inappropriately. The jury necessarily found the complainants credible and rejected the defensive theory. In his brief, Rodriguez points to statements made during his motion for directed verdict where breasts were mentioned. These discussions took place outside of the jury's presence, so the jury did not hear them. This factor weighs against finding egregious harm. *See Arrington*, 451 S.W.3d at 844.

### 3. Parties' Arguments

We next address the parties' arguments to determine whether the evidence made it more or less likely that the jury-charge errors egregiously harmed Rodriguez. *See Arrington*, 451 S.W.3d at 840; *Almanza*, 686 S.W.2d at 171.

Rodriguez claims the fact that the State asked the jury to review specific items of evidence, and because those items contained within them references that Rodriguez touched Rhea's breasts, it meant that the State highlighted those records which weighed in favor of egregious harm. Neither party mentioned Rodriguez touching Rhea's breasts during opening or closing. Rather, both sides focused on Rodriguez touching the girls' genitals. The evidence the State asked the jury to review in closing did not show that Rodriguez only touched Rhea's breasts, rather they showed he touched her vagina and breasts. The State did not point out any specific pages for the jury that contained references to the breasts. During opening and closing, the defense argued that this did not and could not have happened the way the complainants' alleged.

Neither party clarified during opening nor closing that the jury could not consider evidence of breast touching for the continuous sexual abuse of a child offense. Likewise, the parties did not mention unanimity in their arguments. After considering the parties' arguments, we conclude the charge error "was not exacerbated or ameliorated" since their arguments did not reference touching of the breasts, and therefore, this factor is neutral with respect to a finding of egregious harm. *See Arrington*, 451 S.W.3d at 844 (explaining that where arguments did not exacerbate or ameliorate the charge error, the factor "weighs neither for nor against a finding of egregious harm").

## 4. All Other Relevant Information in the Record

Once the jury had a verdict, the trial court asked the foreperson if it was unanimous, and the foreperson indicated it was. Rodriguez's attorney then polled the jury, and all twelve individually responded they found Rodriguez guilty. Given that the record supports the jury's verdict was unanimous, this factor weighs against a finding of egregious harm, particularly with respect to any error in failing to give a separate unanimity instruction. *See id.* at 845.

## 5. Consideration of the Four Factors

The only factor that could weigh in favor of harm, albeit theoretical, was the definition of sexual contact that included breasts which carried forward into the application paragraph that tracked the indictment. As explained above, the use of the conjunctive "and" in the application paragraph reduced the likelihood that Rodriguez suffered actual egregious harm because of the error. Although the instructions and application included the touching of the breast as a potential act of sexual abuse not allowed by the statute, the conduct as described relevant to Rhea was that Rodriguez engaged in sexual contact with her by touching her vagina *and* breasts. The evidence focused on Rodriguez touching both complainants' genitals rather than breasts. Finally, there was no evidence that Rodriguez touched only Rhea's breasts, rather the evidence showed he touched her vagina and breasts many times over many years. His defensive theory was that he never touched either girl inappropriately, and they

60

made it up. Any harm did not affect "the very basis of the case," "deprive the defendant of a valuable right," or "vitally affect a defensive theory." *Cosio*, 353 S.W.3d at 777 (quoting *Almanza*, 686 S.W.2d at 171). Since any harm was theoretical, rather than actual, the charge errors did not cause Rodriguez egregious harm. *See id.*; *see also Arrington*, 451 S.W.3d at 840; *Almanza*, 686 S.W.2d at 171. We overrule issues one and two.

## E. Analysis: Issue Three–Unanimous Verdict

In issue three, Rodriguez complains that the lack of a "statutory unanimity instruction" denied him his constitutional right to a unanimous jury verdict. As discussed above, the continuous sexual abuse statute does not require the jury to agree on the same predicate acts of sexual abuse to convict him. *See* Tex. Penal Code Ann. § 21.02(d); *Jacobsen*, 325 S.W.3d at 737. The trial court also polled the jury, and it was unanimous. Thus, the record shows that the omission of an unanimity instruction did not produce actual harm to Rodriguez in the form of a nonunanimous verdict. We overrule issue three.

## F. Analysis: Issue Five–Cumulative Harm

In his fifth issue, Rodriguez argues that the cumulative harm from multiple errors in the jury charge deprived him of a fair trial and vitally affected his defensive theory. Specifically, he asserts, "It is possible that a synergistic effect based on multiple jury charge errors can weigh in favor of finding harm when consideration

61

of the errors in isolation may not." As discussed in our egregious harm analysis above, even with two errors in the charge, the only factor favoring egregious harm was the first factor, and we concluded any harm was likely theoretical. The Court of Criminal Appeals is clear that appellate courts do not reverse and remand for a new trial based on theoretical harm. *See Alcoser*, 663 S.W.3d at 171 (noting that "the windfall of a new trial based on only theoretical harm" is something *Almanza* forbids); *see also Arrington*, 451 S.W.3d at 840 (explaining egregious harm determination must be based on actual rather than theoretical harm); *Cosio*, 353 S.W.3d at 777 (same); *Almanza*, 686 S.W.2d at 174 (same). We overrule issue five.

## IV. ISSUE SIX: INEFFECTIVE ASSISTANCE OF COUNSEL

In issue six, Rodriguez complains he was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments. He complains that counsel was deficient for failing to object to the jury charge and to the State's expert witnesses, Gates and Garzoria, improperly providing an opinion on the truthfulness of the complainants.

### A. Standard of Review and Applicable Law

To establish ineffective assistance of counsel, a defendant must satisfy the following test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the

deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Perez v. State*, 310 S.W.3d 890, 892–93 (Tex. Crim. App. 2010). "Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Defendants are not entitled to errorless representation. *Frangias v. State*, 450 S.W.3d 125, 136 (Tex. Crim. App. 2013). We look to the totality of the representation when examining a claim of ineffectiveness. *See id.*; *see also Thompson*, 9 S.W.3d at 813. "To show prejudice, 'the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994) (quoting *Strickland*, 466 U.S. at 694); *see also Graves v. State*, 310 S.W.3d 924, 929 (Tex. App.—Beaumont 2010, pet. ref'd).

"Appellate review of defense counsel's representation is highly deferential and presumes that counsel's actions fell within the wide range of reasonable and professional assistance." *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). "Under normal circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or

63

strategic decisionmaking as to overcome the presumption that counsel's conduct was reasonable and professional." *Id.*; *see also Estrada v. State*, 313 S.W.3d 274, 311 (Tex. Crim. App. 2010) (explaining record was insufficient to show that counsel's representation was ineffective where record failed to show that counsel's representation lacked tactical and strategic decisionmaking). If trial counsel is not given the opportunity to explain his actions, "then the appellate court should not find deficient performance unless the challenged conduct was 'so outrageous that no competent attorney would have engaged in it.'" *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)).

## B. Analysis

### 1. Failing to Object to Expert Testimony on Complainants' Truthfulness

This record does not show that Rodriguez filed a motion for new trial alleging ineffective assistance. The record is silent as to trial counsel's tactical and strategic decisionmaking regarding the questioning of witnesses. *See Estrada*, 313 S.W.3d at 311; *Bone,* 77 S.W.3d at 833. Although CPS concluded their investigation with a "reason to believe" determination, contrary to Rodriguez's assertion in his brief, neither witness testified that the children were truthful. Rather, CPS Investigator Gates was asked why she remembered this case, and she said she remembered Mother did not procrastinate, how long it took for her to reach Rodriguez, and that

the child's outcry was "humble" and "innocent." When asked if it appeared the child had been coached, Gates said it did not appear that way, and when asked, she said that nobody from Rodriguez's family suggested the girls made this up. CPS Supervisor Garzoria testified she did not notice inconsistencies in the girls' stories but noticed their outcries were delayed. She testified that CPS concluded there was "reason to believe" that the children made a credible outcry and noted that their statements were consistent.

The record also shows that Rodriguez's counsel followed up with questions undermining CPS's investigation, specifically that they failed to talk to other witnesses that may have been present at the times the girls said they were abused, and they failed to follow protocol by notifying Rodriguez about their conclusion. Counsel may have had a legitimate strategy for not objecting to these witnesses' testimony, such as not wanting to call further attention to it. The record is silent about why counsel did not object but also shows that he engaged in cross-examination seeking to undermine the CPS investigation. Since trial counsel has not been given the opportunity to explain his actions and we cannot say the conduct was so outrageous no competent attorney would have engaged in it, we cannot find his performance deficient. *See Menefield*, 363 S.W.3d at 593; *Goodspeed*, 187 S.W.3d 392. On this record, we conclude that Rodriguez has failed to show counsel's failure to object to the complained-of testimony was deficient, thus he cannot meet

65

*Strickland's* first prong. *See Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892–93.

## 2. Failing to Object to the Jury Charge

In our jury charge discussion *supra*, we outlined how charge errors did not egregiously harm Rodriguez. Even assuming counsel's performance was deficient for failing to object to the charge, Rodriguez cannot demonstrate that, but for counsel's alleged errors, the outcome of his trial would have been different. *See Strickland*, 466 U.S. at 694; *Jackson*, 877 S.W.2d at 771 (citation omitted); *Graves*, 310 S.W.3d at 929 (assuming without deciding appellant met the first prong of *Strickland*, he did not demonstrate that, but for counsel's alleged ineffective assistance, the trial result would have been different).

We cannot say that failure to object to the CPS witnesses constituted deficient performance as the record is silent as to any potential strategy but shows that counsel cross-examined the witnesses about their failure to interview potential witnesses and follow protocol. Rodriguez has also failed to show that he was prejudiced by counsel's failure to object to the jury charge. Looking at the totality of the representation, Rodriguez did not receive ineffective assistance of counsel. *See Frangias*, 450 S.W.3d at 136; *Thompson*, 9 S.W.3d at 813; *see also Strickland*, 466 U.S. at 687 (outlining the two prongs that must be met to show ineffective assistance of counsel). We overrule issue six.

## V. ISSUE SEVEN: EVIDENTIARY ISSUES, HEARSAY STATEMENTS

In issue seven, Rodriguez asserts that the trial court committed reversible error in admitting certain hearsay statements from five of the complainants' friends as prior consistent statements.

### A. Standard of Review and Applicable Law

We review a trial court's determination on the admissibility of a prior consistent statement for an abuse of discretion, and we do not reverse if the judge's decision lies within the zone of reasonable disagreement. *See Hammons v. State*, 239 S.W.3d 798, 806 (Tex. Crim. App. 2007); *Fears v. State*, 479 S.W.3d 315, 332 (Tex. App.—Corpus Christi 2015, pet. ref'd). A trial court does not abuse its discretion if some evidence supports its decision. *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002). We will uphold a trial court's evidentiary ruling if correct on any theory of law applicable to the case. *See De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

Rule 801(e)(1)(B) designates prior consistent statements made by a declarant-witness as non-hearsay when those statements are offered to rebut an express or implied charge that the declarant recently fabricated her testimony or acted from a recent improper influence or motive. *See* Tex. R. Evid. 801(e)(1)(B); *Klein v. State*, 273 S.W.3d 297, 304 (Tex. Crim. App. 2008). A trial court has substantial discretion to admit a prior consistent statement even if there has been only a suggestion of

conscious alteration or fabrication. *Fears*, 479 S.W.3d at 332 (citing *Hammons*, 239 S.W.3d at 804–05). Among Rule 801(e)(1)(B)'s requirements, a prior consistent statement must be made before the time the supposed motive to falsify arose. *See Hammons*, 239 S.W.3d at 804. The motive to falsify can arise at any time, including during the declarant-witness's direct examination. *See Klein*, 273 S.W.3d at 313. In *Hammons*, the Texas Court of Criminal Appeals explained that:

> [A] reviewing court, in assessing whether the cross-examination of a witness makes an *implied* charge of recent fabrication or improper motive, should focus on the "purpose of the impeaching party, the surrounding circumstances, and the interpretation put on them by the [trial] court." Courts may also consider clues from the voir dire, opening statements, and closing arguments. From the totality of the questioning, giving deference to the trial judge's assessment of tone, tenor, and demeanor, could a reasonable trial judge conclude that the cross-examiner is mounting a charge of recent fabrication or improper motive? If so, the trial judge does not abuse his discretion in admitting a prior consistent statement that was made before any such motive to fabricate arose.

*Hammons*, 239 S.W.3d at 808–09 (footnotes omitted).

"[I]t is unnecessary that a prior consistent statement have been made before *all* motives to fabricate arose." *Dowthitt v. State*, 931 S.W.2d 244, 264 (Tex. Crim. App. 1996). Said another way, "[a] prior consistent statement . . . need not predate each alleged improper influence; it need only predate one alleged improper influence." *Dibello v. State*, 432 S.W.3d 913, 916 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd).

**B. Analysis**

Despite Rodriguez's assertions at certain points in the trial that he did not want to call his granddaughters liars, in voir dire and in opening insinuated that the children initially lied, but "the snowball's rolling" and when strangers "wearing uniforms" show up to conduct interviews and examinations, they had an ongoing motive not to tell everyone they made it up. *See Hammons*, 239 S.W.3d at 808–09 (allowing courts to consider clues from voir dire, opening and closing when determining whether there has been a charge of recent improper motive). Also during voir dire, the defense seemingly referenced the court process and said, "I submit to you most kids don't know if you say something that two or three years later you're going to have to come and talk about it in front of anybody[,]"and discussed with jurors that the kids reasons for continuing with the story was that they were "embarrassed about lying." *See id.* Additionally, during voir dire, Rodriguez discussed how the "one witness rule" and how "identification is so powerful" and that if a witness is "young" they "can be persuaded by all kind of factors." *See id.* Rodriguez also discussed the possibility in voir dire that the children wanted to please someone in authority like a forensic interviewer. *See id.*

In opening, Rodriguez said sometimes kids "say something they don't necessarily understand . . . in court they could have stopped it and said, never mind we're not telling the truth . . . that little snowball that turns into a giant avalanche at

69

the bottom." *See id.* He also encouraged jurors to focus on the "veracity of the witnesses[.]" Rodriguez also testified that Gail and Rhea made it up. *See id.* In closing arguments Rodriguez again insinuated the girls lied and said that the fact that witnesses did their jobs did not mean the girls were telling the truth. *See id.*

Rodriguez's attorney questioned Mother about whether there was a money issue and if Rodriguez loaned her family a car, implying that served as a motive. Additionally, when cross-examining Mother, she testified about the girls' outcries and that Gail accused him of touching her privates, and Rhea accused him of touching her breasts after the SANE exam; Rodriguez then noted that was "kind of a vague statement, but over time it got a little more specific as far as dates and times[.]" Rodriguez also insinuated that the parents had marital problems in the summer of 2019, when the last of the incidents allegedly occurred, which could have provided a motive.

The complained-of witnesses were all friends and peers of Gail and Rhea; they were not authority figures and testified the girls consistently said Rodriguez sexually abused them. B.S. ("Ben") and B.S. ("Bill") were brothers and friends who Gail told the day of Rachel's Challenge about the abuse and before she reported anything to Mother.[3] A.M. ("Alan") and K.D. ("Kim") were Gail's other friends who testified

---

[3]To protect their privacy, we refer to all witnesses in this section by pseudonyms, since they were minors when they testified.

70

that in 2021, she told them that she was sexually abused by her grandfather but did not provide details, which occurred before she testified in court. Finally, E.C. ("Eve"), Rhea's friend, testified that two years before trial, they were at a sleepover, and Rhea told her that her grandfather molested Rhea and her sister.

Here, Rodriguez's strategy at trial was that the girls lied in court and lied when they talked to authorities and forensic interviewers. Rodriguez offered varying motivations for the girls to do so, including, among others that: (1) they were embarrassed to testify in court that they had lied from the beginning; (2) that they were affirming what they thought forensic interviewers, the SANE, and law enforcement wanted to hear; (3) their parents had marital problems in the summer of 2019; and (4) in 2019, there was a financial dispute their parents and grandparents had over a car. Years before they testified in court, Rhea and Gail told all five witnesses their grandfather sexually abused them, which would negate the improper motive their own embarrassment about lying somehow shaped their court testimony. So, although the statements did not arise before all alleged improper motives, they negated at least one. *See Dowthitt*, 931 S.W.2d at 264; *Dibello*, 432 S.W.3d at 916. With respect to brothers Ben and Bill, Gail's prior consistent statements to them arose before she spoke to any authority figures, thus negating the improper motive of affirming what authority figures desired to hear. *See Dowthitt*, 931 S.W.2d at 264; *Dibello*, 432 S.W.3d at 916.

71

Deferring to the trial court's substantial discretion in admitting the prior consistent statements under Rule 801(e)(1)(B), we conclude the trial court was not outside the zone of reasonable disagreement by admitting the testimony of the complainants' friends regarding their prior consistent statements. *See Hammons*, 239 S.W.3d at 806; *Fears*, 479 S.W.3d at 332; *see also* Tex. R. Evid. 801(e)(1)(B). We overrule issue seven.

## CONCLUSION

Having overruled Rodriguez's issues, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on August 30, 2024
Opinion Delivered April 23, 2025
Do Not Publish

Before Golemon, C.J., Wright and Chambers, JJ.